**Robert BARNETT, Plaintiff–Appellant,**

v.

**U.S. AIR, INC., Defendant–Appellee.**

**No. 96–16669.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 22, 2000.

Filed Oct. 4, 2000.

Richard L. Davis (on brief), Menlo Park, California, Robert W. Rychlik (argued), Palm Desert, California, for the plaintiff-appellant.

Raymond W. Thomas, Los Angeles, California, for the defendant-appellee.

Susan L.P. Starr (argued), Julie L. Gantz (on brief), Washington, D.C., for the amicus curiae.

Before: HUG, Chief Judge, SCHROEDER, FLETCHER, PREGERSON, O'SCANNLAIN, TROTT, KLEINFELD, TASHIMA, THOMAS, FISHER, GOULD, Circuit Judges.

Opinion by Judge FLETCHER; RONALD M. GOULD, Circuit Judge, with whom Circuit Judge THOMAS joins, Concurring; O'SCANNLAIN, Circuit Judge, with whom Circuit Judges TROTT and KLEINFELD join, Dissenting; TROTT, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and KLEINFELD join, Dissenting.

FLETCHER, Circuit Judge:

Robert Barnett brought suit under the Americans with Disabilities Act (ADA) and he appeals the district court's dismissal on summary judgment of his claims. Barnett, who suffered a serious back injury while on the job, argues that U.S. Air discriminated against him by denying him accommodation, by failing to engage in the interactive process and by retaliating against him for filing charges with the Equal Employment Opportunity Commission (EEOC). This appeal raises several issues of first impression in this circuit, including the nature and scope of an employer's obligation to engage in the interactive process, whether reassignment is a reasonable accommodation in the context of a seniority system and the appropriate standard for evaluating retaliation claims under the ADA. We reverse the district court's grant of summary judgment in favor of U.S. Air on all claims except for the retaliation claim and we remand for trial.

I

Robert Barnett worked for ten years as a customer service agent for U.S. Air and its predecessor, Pacific Southwest Airlines. In 1990, Barnett injured his back while working in a cargo position for U.S. Air at San Francisco International Airport. After returning from disability leave, Barnett found that he could not perform all of the physical requirements of handling freight. Barnett used his seniority to transfer into the company's mail room.

In March and August of 1992, Barnett's doctor and chiropractor both recommended that he avoid heavy lifting and excessive bending, twisting, turning, pushing and pulling, and prolonged standing or sitting. The doctor concluded that Barnett could perform the job requirements of the swing-shift mail room position. Barnett learned in August of 1992 that two employees with greater seniority planned

to exercise their seniority right to transfer to the mail room. Once bumped, Barnett's seniority would have limited him to transferring to jobs in the cargo area. Barnett wrote to his station manager, Robert Benson, on August 31, 1992 and requested that he be allowed to stay in the mail room as a reasonable accommodation under the ADA.

U.S. Air did not respond to Barnett for five months but allowed him to remain in the mail room for the period while the company was evaluating his claims. On January 20, 1993, Benson, acting on behalf of U.S. Air, informed Barnett that he would be removed from the mail room and placed on job injury leave. There was no substantive discussion of Barnett's accommodation request. Following the meeting, Barnett sent Benson a second letter suggesting two alternative means of accommodating his disability. Barnett proposed either that U.S. Air provide him with special lifting equipment in the cargo facility or that the cargo job be restructured so that he would do only warehouse office work.

Barnett filed formal charges of discrimination with the EEOC in February of 1993. On March 4, 1993, Barnett received a letter from U.S. Air's Vice President of Human Resources denying Barnett's alternative requests for accommodation but informing him that he could bid for any job within his restrictions. There is no evidence that Barnett was qualified, without reasonable accommodation, for any other position in San Francisco or elsewhere in the U.S. Air system. Barnett made no subsequent bids for any other position. In August of 1994, the EEOC issued a formal determination that there was reason to believe that U.S. Air had discriminated against Barnett by denying him reasonable accommodation under the ADA.

After Barnett filed suit, the district court granted U.S. Air's motion for summary judgment for all claims except Barnett's claim that U.S. Air discriminated by not participating in the interactive process. Upon receiving supplementary briefing, the district court granted summary judg-ment to U.S. Air on that claim as well. Barnett, in his appeal, argues that U.S. Air violated the ADA by failing to engage in the interactive process, by failing to reassign him to the mail room, by failing to provide other reasonable accommodation and by retaliating against him.

## II

We review de novo the district court's grant of summary judgment. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). In determining whether there are any genuine issues of material fact, we must view the evidence in the light most favorable to the nonmoving party. *Id.*

Barnett claims that U.S. Air had an obligation to engage in an interactive process to identify possible reasonable accommodations. Barnett further asserts that U.S. Air's failure to engage in this process gives rise to liability under the ADA. The district court concluded that an employer is liable for failing to engage in the interactive process but that U.S. Air had sufficiently engaged in the interactive process to avoid such liability.

Although disabled Americans have played prominent roles in our nation's history, from the founders of our Constitution to our longest serving President, they have also faced a long history of exclusion. Congress, in the opening section of the ADA, recognized that some "43,000,000 Americans have one or more physical or mental disabilities" and that:

individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

42 U.S.C. § 12101(a)(7).

The ADA was designed to end the exclusion of people with disabilities from the

workplace and from other realms of social life. As President George Bush explained upon signing the ADA:

Today, we're here to rejoice in and celebrate another 'Independence Day,' one that is long overdue. With today's signing of the landmark Americans for [sic] Disabilities Act, every man, woman, and child with a disability can now pass through once-closed doors into a bright new era of equality, independence and freedom ... Today's legislation brings us closer to that day when no Americans will ever again be deprived of their basic guarantees of life, liberty, and the pursuit of happiness.

President George Bush, "Remarks on Signing the Americans with Disabilities Act of 1990," (July 26, 1990), *reprinted in* Bernard D. Reams, Jr., et. al., eds., *Disability Law in the United States: A Legislative History of the Americans with Disabilities Act of 1990, Public Law 101–336*, Vol. I, Document No. 9 (1992).

In introducing the ADA, Senator Harkin called the statute "a broad and remedial bill of rights for individuals with disabilities. It is their emancipation proclamation." 135 Cong. Rec. S 4984 (May 9, 1989) (statement of Sen. Harkin) *reprinted in Disability Law*, Vol. VI, Document No. 36. Citing a nationwide poll, Senator Harkin pointed out that sixty-six percent of working-age disabled persons who are not working, or some 8.2 million persons, want to have a job and that eighty-two percent of people with disabilities would ·give up their government benefits in favor of full-time employment. *Id.* at S 4985. Thus, the workplace protections of the ADA are central to the Act's goals of assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency" for people with disabilities. 42 U.S.C. § 12101(a)(8).

■■■ Title I of the ADA insures full opportunities for people with disabilities in the workplace by requiring reasonable accommodation of employees' disabilities by their employers. The ADA prohibits employers from discriminating against a disabled employee[1] by "not making rea-

---

1. The district court determined that Barnett was "disabled" under the ADA and U.S. Air concedes that they did not raise this issue to the court on appeal.

In his dissent, Judge O'Scannlain argues that U.S. Air has not waived the issue of whether Barnett is "disabled." However, the law of this circuit is that issues not raised in a party's opening brief are waived. *See Paracor Finance v. General Elec. Capital Corp.*, 96 F.3d 1151, 1168 (9th Cir.1996) (Judge O'Scannlain writing for the court). Only last year, Judge O'Scannlain reaffirmed this principle as the law of our circuit on at least three separate occasions. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999) ("arguments not raised by a party in its opening brief are deemed waived."); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 n. 7 (9th Cir.1999) ("Brookfield chose not to argue its trademark dilution claim or its state law causes of action in its opening brief. We accordingly deem those issues waived."); *Zukle v. Regents of University of California*, 166 F.3d 1041, 1045 n. 10 (9th Cir.1999) ("Zukle did not raise her race, sex or sexual harassment claims in her opening brief; therefore she has waived any

appeal from the district court's grant of summary judgment on these claims."). Issues are deemed waived, as Judge O'Scannlain has pointed out, despite the existence of supplemental briefing. *See Kreisner v. City of San Diego*, 1 F.3d 775, 778 n. 2 (9th Cir.1993).

As we explained in *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir.1994) (internal citation omitted): "We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim." We have consistently regarded issues raised for the first time in reply briefs as waived. *See Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1167 (9th Cir.1997); *McMillan v. United States*, 112 F.3d 1040, 1047 (9th Cir. 1997). Thus, since U.S. Air failed to raise the issue of Barnett's "disability" in its opening and reply brief, this issue was waived despite the filing of supplemental briefs. As U.S. Air saw fit to raise this issue before the district court, before our decision in *Thompson v. Holy Family Hospital*, 121 F.3d 537 (9th Cir. 1997), came down, it had the opportunity to raise the issue in a cross-appeal.

sonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

■ U.S. Air argues that Barnett is not covered under the ADA because he was not "qualified" for the cargo position due to his disability. If Barnett could perform the essential functions of the cargo position "with or without reasonable accommodation" he would be qualified under the ADA. 42 U.S.C. § 12112(b)(5)(A). Furthermore, the statutory definition of a "qualified individual" covers individuals who can perform the "essential functions" of a position which the individual either "holds or desires." Therefore, even if Barnett could not perform the essential functions of the cargo position, if he could perform the essential functions of another position in the company which he "desires" he is covered under the ADA. The plain language of the statute requires this reading of the statute. To read the statute otherwise would render the word "desires" meaningless. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("the Court will avoid a reading which renders some words altogether redundant"). Our conclusion that a

"qualified individual with a disability" includes individuals who could perform the essential functions of a reassignment position, with or without reasonable accommodation, even if they cannot perform the essential functions of the current position is supported by nearly every circuit which has considered the issue. *See Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1161–62 (10th Cir.1999) (en banc) (collecting cases).

Barnett asserts that U.S. Air failed to fulfill its obligation to engage in an interactive process to find a reasonable accommodation. The legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations. The Senate Report explained that: "A problem-solving approach should be used to identify the particular tasks or aspects of the work environment that limit performance and to identify possible accommodations ... employers first will consult with and involve the individual with a disability in deciding on the appropriate accommodation." S.Rep. No. 101–116, at 34 (1989); *see also* H.R.Rep. No. 101–485, pt. 2, at 65 (1990), U.S.Code Cong. & Admin.News at 303, 348.

The ADA authorizes the EEOC to issue regulations implementing the ADA. *See* 42 U.S.C. § 12116. The EEOC regulations outline the nature of the interactive process:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need

---

Furthermore, the facts of this case do not fit under our ruling in *Thompson.* In *Thompson,* the only restriction imposed on the plaintiff was a twenty five-pound lifting restriction. *Id.* at 539. In contrast here, as the dissent concedes, Barnett faced further restrictions regarding prolonged standing or sitting and excessive or repeated bending, twisting, turning, stooping, pulling and pushing. The dissent claims special insight into these restrictions and concludes that the lifting restriction was actually the only "crucial limitation."

There is no basis in the record for this conclusion. The question of whether Barnett is "disabled" is analytically distinct from an analysis of the functions of the mail room position, which the dissent appears to rely on. Nonetheless, the job analysis of the mail room position, which did not involve an assessment of the position's essential functions, still showed that the position did not require prolonged standing or sitting or excessive bending, stooping, pulling or pushing.

of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(*o*)(3).

The phrase "may be necessary" is merely a recognition that in some circumstances the employer and employee can easily identify an appropriate reasonable accommodation. Any doubt that the EEOC views the interactive process as a mandatory obligation is resolved by the EEOC's interpretive guidance, which states that "the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9. The EEOC's Enforcement Guidance also specifies the nature of the interactive process: "The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate accommodation." *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, EEOC Compliance Manual (CCH), § 902, No. 915.002 (March 1, 1999), at 5440.

The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation. An employee requesting a reasonable accommodation should inform the employer of the need for an adjustment due to a medical condition using "'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'" *Id.* at 5438. In some circumstances, according to the EEOC, the employee need not even request the accommodation: "An employer should initiate the reasonable accommodation interactive process without being asked if the employer: (1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." *Id.* at 5459.

Almost all of the circuits to rule on the question have held that an employer has a mandatory obligation to engage in the interactive process and that this obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation. *See Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 952 (8th Cir.1999) ("when the disabled individual requests accommodation, it becomes necessary to initiate the interactive process"); *Smith*, 180 F.3d at 1172 (holding that the duty to engage in the interactive process is triggered once the employee "convey[s] to the employer a desire to remain with the company despite his or her disability and limitations" and that "the obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee"); *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 315 (3d Cir.1999) (holding that the employer's duty to engage in the interactive process is triggered "[o]nce the employer knows of the disability and the employee's desire for accommodations" and that the employer must "'meet the employee half-way'" by requesting additional information) (quoting *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996)); *Bultemeyer*, 100 F.3d at 1285 ("The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help"); *Taylor v. Principal Fin. Group Inc.*, 93 F.3d 155, 165 (5th Cir.1996) ("Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one"). *But see Willis v. Conopco*, 108 F.3d 282, 285 (11th Cir.1997) (holding that the plaintiff must produce

evidence that a reasonable accommodation is available before an employer is obligated to engage in the interactive process).[2]

■ U.S. Air argues that Barnett bears the burden of demonstrating the availability of a reasonable accommodation. To put the entire burden for finding a reasonable accommodation on the disabled employee or, effectively, to exempt the employer from the process of identifying reasonable accommodations, conflicts with the goals of the ADA. The interactive process is at the heart of the ADA's process and essential to accomplishing its goals. It is the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an "undue burden" on employers. Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has.

As the Third Circuit explained, since the regulations require the interactive process to identify appropriate accommodations, "it would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process." *Taylor,* 184 F.3d at 316. At the same time, the employee holds essential information for the assessment of the type of reasonable accommodation which would be most effective.[3] While employers have superior knowledge regarding the range of possible positions and can more easily perform analyses regarding the "essential functions" of each, employees generally know more about their own capabilities and limitations.

■ The statute further does not allow employers to avoid reasonable accommodation absent a showing of undue hardship. The ADA's reasonable accommodation requirement puts the burden on the employer to show that a proposed accommodation will cause undue hardship.[4] *See* 42 U.S.C. § 12112(b)(5)(A) (an employer violates the ADA by "not making reasonable accommodations ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity".).

2. The First Circuit, in *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 515 (1st Cir.1996), opted for a case-by-case approach but explained that "[t]here may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." Later cases have suggested that the employee bears the burden of showing reasonable accommodation but have continued the case-by-case approach: "[t]hese are difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes." *Garcia–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 650 (1st Cir.2000).

3. Under the Rehabilitation Act, the Fifth Circuit held that "the burden of persuasion in proving inability to accommodate always remains on the employer." *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 308 (5th Cir.1981). We followed the Fifth Circuit in holding that "the burden of persuasion in proving inability to accommodate always re-

mains on the employer." *Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir.1985). However, our later cases under the Rehabilitation Act suggested a higher burden for plaintiffs. *See Buckingham v. United States,* 998 F.2d 735, 740 (9th Cir.1993) ("[P]laintiffs must only provide evidence sufficient to make 'at least a facial showing that reasonable accommodation is possible' "); *Mustafa v. Clark County Sch. Dist.,* 157 F.3d 1169, 1176 (9th Cir.1998) ("[Plaintiff] bears the initial burden of showing that 'the suggested accommodation would, more probably than not, have resulted in his ability to perform the essential functions of his job' ").

4. In analyzing undue hardship, the focus is on the impact of a possible accommodation on the employer. Conversely, in assessing reasonable accommodations the primary focus is on whether the accommodation effectively allows a disabled employee to successfully perform the job. *See* 29 C.F.R. Pt. 1630, App. § 1630.9.

██ Therefore, we join explicitly with the vast majority of our sister circuits in holding that the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation. In circumstances in which an employee is unable to make such a request, if the company knows of the existence of the employee's disability, the employer must assist in initiating the interactive process.[5]

We next turn to the requirements of the interactive process. Both the legislative history and the EEOC regulations detail the nature of the interaction required of employers and employees. The Senate Report outlined four steps which employers should follow when engaging in the interactive process:

[T]he Committee believes the employer should consider four informal steps to identify and provide an appropriate accommodation.

The first informal step is to identify barriers to equal opportunity. This includes identifying and distinguishing between essential and nonessential job tasks and aspects of the work environment of the relevant position(s).

... Having identified the barriers to job performance caused by the disability, the second informal step is to identify possible accommodations.

... Having identified one or more possible accommodations, the third informal step is to assess the reasonableness of each in terms of effectiveness and equal opportunity.

... The final informal step is to implement the accommodation that is most appropriate for the employee and the employer and that does not impose an undue hardship on the employer's operation or to permit the employee to provide his or her own accommodation if it does not impose an undue hardship.

... The expressed choice of the applicant or employee shall be given primary consideration unless another effective accommodation exists that would provide a meaningful equal employment opportunity.

S.Rep. No. 101–116, at 35 (1989); *see also* H.R.Rep. No. 101–485, pt. 2, at 66 (1990), U.S.Code Cong. & Admin.News at 348–49.

The EEOC also outlines the four steps critical to the interactive process. Once a request for a reasonable accommodation has been made, the EEOC requires an employer to:

(1) Analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position and;

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. Pt. 1630, App. § 1630.9.

██ The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees. The shared goal is to identify an accommodation that allows the employee to perform the job effectively. Both sides must com-

---

**5.** In keeping with the statutory requirements, employers must notify applicants and employees of the reasonable accommodation provisions, who is entitled to an accommodation and what is necessary to trigger the interactive process. *See* 42 U.S.C. § 12115 ("Every employer, employment agency, labor organization, or joint labor-management committee covered under this subchapter shall post notices in an accessible format to applicants, employees, and members describing the applicable provisions of this chapter.").

municate directly, exchange essential information[6] and neither side can delay or obstruct the process. *See Smith,* 180 F.3d at 1172 ("The interactive process includes good-faith communications between the employer and employee."); *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").

▮ In order to demonstrate good faith, employers can point to cooperative behavior which promotes the identification of an appropriate accommodation. Employers should "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor,* 184 F.3d at 317.

▮ The interactive process requires that employers analyze job functions to establish the essential and nonessential job tasks. In order to identify the barriers to job performance, employers must consult and cooperate with disabled employees so that both parties discover the precise limitations and the types of accommodations which would be most effective. The evaluation of proposed accommodations requires further dialogue and an assessment of the effectiveness of each accommodation, in terms of enabling the employee to successfully perform the job. *See* 29 C.F.R. Pt. 1630, App. § 1630.9.

Once the employer and employee have identified and assessed the range of possible reasonable accommodations, the legislative history directs that "the expressed choice of the applicant shall be given primary consideration unless another effective accommodation exists that would provide a meaningful equal employment opportunity." S.Rep. No. 101–116, at 35 (1989); *see also* H.R.Rep. No. 101–485, at 67 (1990). An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position.

We next turn to the consequences for employers who fail to engage in the interactive process in good faith. The Seventh Circuit held that "courts should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility" so that "[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Beck,* 75 F.3d at 1135–37.

▮ Most circuits have held that liability ensues for failure to engage in the interactive process when a reasonable accommodation would otherwise have been possible. *See Smith,* 180 F.3d at 1174; *Taylor,* 184 F.3d at 317–18; *Bultemeyer,* 100 F.3d at 1285; *Principal,* 93 F.3d at 165. The range of possible reasonable accommodations, for purposes of establishing liability for failure to accommodate, can extend beyond those proposed:

> an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations. In making that determination, the jury is entitled to bear in mind that had the

6. Under the Rehabilitation Act, employers were required to "gather sufficient information from the applicant and from qualified experts as needed to determine what accommodations are *necessary* to enable the applicant to perform the job safely." *Mantolete,* 767 F.2d at 1423. We note that an employer cannot ask an employee for documentation unrelated to establishing the existence of a disability and the necessity of accommodation. Therefore, an employer generally cannot ask for an employee's complete medical records because they are likely to contain information unrelated to the disability at issue. *See EEOC Enforcement Guidance,* EEOC Compliance Manual at 5440.

employer participated in good faith, there may have been other, unmentioned possible accommodations. *Taylor*, 184 F.3d at 317–318.

A number of circuits have further held that an employer cannot prevail at summary judgment if there is a genuine dispute as to whether the employer engaged in the interactive process in good faith. *See Fjellestad*, 188 F.3d at 953 ("we find that summary judgment is typically precluded when there is a genuine dispute as to whether the employer acted in good faith and engaged in the interactive process of seeking reasonable accommodations"); *Taylor*, 184 F.3d at 318 ("where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded"); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633–34 (7th Cir.1998) (refusing to grant an employer summary judgment because disputes of fact remained about which party caused the breakdown in the interactive process).

The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace. Employers who reject this core process must face liability when a reasonable accommodation would have been possible. Without the interactive process, many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations. The result would be less accommodation and more litigation, as lawsuits become the only alternative for disabled employees seeking accommodation. This is a long way from the framework of cooperative problem solving based on open and individualized exchange in the workplace that the ADA intended. Therefore,

summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith.

 We hold that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. We further hold that an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process.[7]

 In this case, Barnett triggered the interactive process obligation by communicating to U.S. Air his desire for accommodation based on his disability. In fact, Barnett went even further and identified, in addition to assignment to the mail room, at least two different accommodations which might have allowed him to remain in the cargo facility. However, U.S. Air appears not to have seriously considered the suggestions.

U.S. Air rejected all three of Barnett's proposed reasonable accommodations and offered no practical alternatives. The special lifting equipment Barnett requested for the cargo position may well have been an adequate reasonable accommodation. Barnett researched mechanical lifting devices and proposed that U.S. Air purchase a low-tech device to assist him in the loading and unloading of cargo. U.S. Air's only offer was for a forklift to lift individual suitcases. Proposing the use of a forklift to lift an individual suitcase is like giving Barnett a shotgun to swat a fly or a Phillips head screwdriver for a flat screw. U.S. Air might as well have told Barnett to use a backhoe. That a tool performs a similar function doesn't make it a proper tool for a particular job. Barnett sought a mechanical accommodation to compensate for his disability; U.S. Air, in effect, ig-

---

**7.** If an employer fails to participate in or obstructs the interactive process, injunctive relief is an available remedy to insure compliance with the requirement of good faith interaction and to require reasonable accom-

modation. *See* 42 U.S.C. § 12117(a) (making injunctive relief available under Title I of the ADA by incorporating the remedies of § 2000e–5).

nored his request. Thus, U.S. Air's failure to engage in the interactive process foreclosed at least one potentially reasonable accommodation.

It is less clear whether Barnett's other suggestion of modifying the cargo position to require only desk work was a reasonable accommodation. Although U.S. Air argues that this accommodation would require the elimination of essential functions of the cargo job, it may only have required reassignment of functions among personnel. Although U.S. Air had performed a job analysis on the position in 1992, for purposes of workers' compensation, this analysis did not involve an assessment of the position's essential functions. The duties of the cargo position were divided between front office, warehouse and lifting cargo. Not all cargo agents lifted cargo on any given day and employees were apparently allowed to trade job duties and avoid lifting cargo. Yet, the title of the position is a general one of "cargo agent." Thus, there is a sufficient factual dispute to require further proceedings to evaluate whether this accommodation would have required any elimination of the essential functions of the position.

U.S. Air rejected each of Barnett's several proposed reasonable accommodations and merely offered that Barnett could apply for any position for which he was qualified given his restrictions and for which he had sufficient seniority. U.S. Air did not seek to have a dialogue with Barnett but instead rejected his proposed accommodations by letter. The time between Barnett's initial accommodation request and U.S. Air's rejection letter was nearly five months. This delay and U.S. Air's failure to communicate do not reflect good faith engagement in the interactive process on the part of U.S. Air. Nor is U.S. Air's offer to Barnett to bid on other jobs, a right he already had, a reasonable accommodation of a disabled employee. There is no evidence in the record that Barnett was qualified for any other position, without accommodation, in San Francisco or elsewhere in the U.S. Air system. This is not a case where it is obvious that no modification

could enable the employee to perform the essential functions of a job or where the employee has caused the process to break down. Given U.S. Air's failure to engage in the interactive process, liability would be appropriate if a reasonable accommodation would otherwise have been possible. There remains conflicting evidence in the record as to whether a reasonable accommodation without undue hardship to the employer was possible. Thus, a triable issue of fact exists on this issue.

### III

Barnett argues that it would have been a reasonable accommodation for U.S. Air to allow him to remain in the mail room, by making an exception to its seniority policy. The ADA explicitly states that reasonable accommodation may include reassignment. *See* 42 U.S.C. § 12111(9)(B). The key questions are whether a seniority system is a per se bar to reassignment as a reasonable accommodation and whether a disabled employee seeking reasonable accommodation should have priority in reassignment.

The EEOC's enforcement guidance makes it clear that reassignment is a reasonable accommodation to which disabled employees should have priority over nondisabled employees and even when transfers are normally not allowed:

> The ADA requires employers to provide reasonable accommodations to individuals with disabilities, including reassignment, even though they are not available to others. Therefore, an employer who does not normally transfer employees would still have to reassign an employee with a disability, unless it could show that the reassignment caused an undue hardship. And, if an employer has a policy prohibiting transfers, it would have to modify that policy in order to reassign an employee with a disability, unless it could show undue hardship.

*EEOC Enforcement Guidance,* EEOC Compliance Manual at 5454.

The EEOC explains that a modification in workplace policy can be a reasonable

accommodation, absent undue hardship: "[Reassignment] must be provided to an employee who, because of a disability, can no longer perform the essential functions of his/her current position, with or without reasonable accommodation, unless the employer can show that it would be undue hardship." *Id.* at 5452.

U.S. Air argues that the ADA guarantees Barnett no more than the opportunity to apply for and compete for reassignment. However, the EEOC leaves no doubt that reassignment involves more than a mere opportunity for disabled employees to compete: "Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended." *Id.* at 5456.

En banc decisions in several circuits adopt the EEOC's position. In *Aka v. Washington Hospital Center* 156 F.3d 1284 (D.C.Cir.1998) (en banc), the D.C. Circuit, sitting en banc, rejected the argument that reassignment entitles a disabled employee to nothing more than a chance to compete for a position. The D.C. Circuit explained that the view that the ADA requires no priority for disabled employees in reassignment "misunderstand[s] both the text and legislative history of the statute, and deviate[s] from the construction of the statute by other circuits ... Indeed the ADA's reference to reassignment would be redundant if permission to apply were all it meant." *Id.* at 1304.

The Tenth Circuit, sitting en banc, also made clear that the ADA's "reassignment obligation must mean something more than merely allowing a disabled person to compete equally with the rest of the world" and pointed out that reassignment is "one of the forms of reasonable accommodation specifically mentioned by the statute to be utilized if necessary and reasonable to keep an existing disabled employee employed by the company." *Smith,* 180 F.3d at 1165.

The question of whether an employer's unilaterally imposed seniority system trumps a disabled employee's right to reassignment has not been answered directly by any other circuit.[8] Although

---

8. At best other circuits have opined in dicta as to what approaches the courts should take. In *Smith,* 180 F.3d at 1176, the Tenth Circuit, in discussing the various situations an employer might face in making a reassignment opined (although the issue was not before it) that "an industry may have a well entrenched seniority system which, even though not rooted in a collective bargaining agreement, is so well established that it gives rise to legitimate expectations by other, more senior employees to a job that the disabled employee might desire. Requiring an employer to disrupt and violate any such well-established reasonable expectations of seniority rights in order to favor a disabled employee in a job reassignment could, at least under some circumstances, constitute a fundamental and unreasonable alteration in the nature of the employer's business." The court cites to *Aka* at 156 F.3d at 1305. *Aka* had at issue a dispute over Aka's job qualifications and the meaning of the collective bargaining agreement that allowed the employer latitude in some circumstances in reassignment of disabled employees after stating "It seems clear that WHC [the employer] had power under Section 14.5 of the CBA to reassign its disabled employees to vacant positions in at least some circumstances." *Id.* at 1303. It remanded for trial. The court concluded with this statement: "Given the large number of contingencies that could preclude such a conflict, we see no need to address whether, if such a conflict arose, the CBA or the ADA would give way in the circumstances of this case." *Id.* at 1306. *Aka* refers to *Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667 (7th Cir.1998). The issues before the Seventh Circuit were the qualifications of disabled employees for available jobs: "If any of the plaintiffs had been able to point to a particular job that was filled by a temporary worker while a plaintiff was on disability leave, and then had been able to show that he or she could have done that job consistent with the relevant qualifications, summary judgment would have been wrong. But no one was able to do so." *Id.* at 679–80. In dicta, it opined that the duties of the employer under the ADA to reassign do not go so far as to extend [the duty to reassign] "to virtually every other job in a company, from the president to the janitors. Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Id.*

there is no legislative history specifically on a seniority system outside of the collective bargaining context, the legislative history that does exist argues against any per se rule barring reassignment in the context of seniority systems.

The legislative history indicates that a collective bargaining agreement can be a factor in determining the reasonableness of an accommodation but rejects any per se bar. As explained in the House Report:

> if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to the job. However, the agreement would not be determinative on the issue.

H.R.Rep. No. 101–485, pt. 2, at 63 (1990), U.S.Code Cong. & Admin.News at 345; *see also* S.Rep. No. 101–116, at 32 (1989). In addition to rejecting a per se bar, both reports envision that collective bargaining agreements will incorporate provisions allowing for compliance with the ADA "by ensuring that agreements negotiated after the effective date of this title contain a provision permitting the employer to take all actions necessary to comply with this legislation." *Id.*

The EEOC also rejects any blanket rule that a collective bargaining agreement trumps a reasonable accommodation: "In the EEOC's view, such a per se rule nullifies Congress' intent that undue hardship always be determined on a case-by-case basis." *EEOC Guidance,* EEOC Compliance Manual at 5463. Instead, the EEOC requires a fact specific analysis which treats the collective bargaining agreement (CBA) as another factor in judging undue hardship:

> First, an employer should determine if it could provide a reasonable accommodation that would remove the workplace barrier without violating the CBA. If no reasonable accommodation exists that avoids violating the CBA, then the ADA requires an employer and a union, as a collective bargaining representative, to negotiate in good faith a variance to the CBA so that the employer may provide a reasonable accommodation, except if the proposed accommodation unduly burdens the expectations of other workers (i.e., causes undue hardship). Undue hardship must be assessed on a case-by-case basis to determine the extent to which the proposed accommodation would affect the expectations of other employees. Among the relevant factors to assess would be the duration and severity of any adverse effects caused by granting a variance and the number of employees whose employment opportunities would be affected by the variance.

*Id.*

Both the legislative history and the EEOC reject any per se rule barring reasonable accommodation even when reassignment would conflict with a collective bargaining agreement.[9] Here, where there is no collective bargaining agreement, no bargained for rights are involved. It would seem that the seniority system without more should not bar reassignment. Without reassignment as a reasonable ac-

---

**9.** Despite this guidance in the legislative history and the EEOC, most circuits including our own have reached the opposite conclusion and held that the ADA does not require an accommodation which conflicts with a collective bargaining agreement. *See Davis v. Florida Power & Light Co.,* 205 F.3d 1301, 1307 (11th Cir.2000); *Willis v. Pacific Maritime Assoc.,* 162 F.3d 561 (9th Cir.1998); *Feliciano v. State of Rhode Island,* 160 F.3d 780, 787 (1st Cir.1998); *Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir.1998); *Kralik v. Durbin,* 130 F.3d 76, 83 (3d Cir.1997); *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 810 (5th Cir.1997); *Eckles v. Consol. Rail Corp.,* 94 F.3d 1041, 1051 (7th Cir.1996); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir.1995); *Benson v. Northwest Airlines,* 62 F.3d 1108, 1114 (8th Cir.1995). *Willis* has been held in abeyance pending the completion of the en banc proceedings in this case. None of the cases listed in this footnote confronted the question presented to us-we confront a seniority system not grounded in a collective bargaining agreement.

commodation, even in the context of a seniority system, the goals of the ADA could easily be frustrated. Any per se rule barring reassignment because of conflicts with a seniority system would sharply limit the range of available accommodations without any required showing of an undue burden on the employer. In many cases this would eliminate the most effective or the only effective reasonable accommodation.

A per se bar conflicts with the basic premise of the ADA, which grounds accommodation in the individualized needs of the disabled employee and the specific burdens which such accommodation places on an employer. Only in the event of "undue hardship" can a seniority system be a bar to reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A). The ADA defines "undue hardship" as "an action requiring significant difficulty or expense." 42 U.S.C. 12111(10)(A). The statute offers a list of factors to be considered in appraising whether there is undue hardship, including the cost of the accommodation, the overall financial resources of the company and the scope of the employer's operations. *See* 42 U.S.C. 12111(10)(B).[10] While reassignment might constitute an undue burden in some cases, courts cannot assume that which is the employer's burden to prove.

■ We hold that reassignment is a reasonable accommodation and that a seniority system is not a per se bar to reassignment. However, a seniority system is a factor in the undue hardship analysis. A case-by-case fact intensive analysis is required to determine whether any particular reassignment would constitute an undue hardship to the employer. If there is no undue hardship, a disabled employee who seeks reassignment as a reasonable accommodation, if otherwise qualified for a position, should receive the position rather than merely have an opportunity to compete with non-disabled employees.

■ Summary judgment was inappropriate in this case. Barnett initiated the interactive process and suggested remaining in the mail room as his preferred accommodation. U.S. Air did not show that the proposed accommodation was an undue hardship. Barnett already occupied the mail room position at the time of his request for reasonable accommodation. Therefore, permanently reassigning Barnett to the mail room position as a reasonable accommodation did not require "bumping" any other employee from the position. While this accommodation would eliminate one position from the seniority bid process, U.S. Air has failed to demonstrate that doing so would cause an undue hardship. It would need to demonstrate that accommodating Barnett in this fashion would cause undue disruption in its seniority system. In its rebuttal, U.S. Air offered only the statement of its Vice President of Human Resources, who feared a "domino effect," and a copy of its seniority policy. Yet the record provides no information concerning the number of ADA

10. The ADA has no language protecting the operation of a "bona fide seniority system" similar to that which is included in Title VII. *See* 42 U.S.C. § 2000e–2(h). We note that the "undue hardship" standard in the ADA is substantially more demanding than the hardship standard in Title VII in the context of "reasonable accommodation" for the religion of employees. *See Trans World Airlines v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1053 (9th Cir.1999) (en banc) (relying on *Hardison* in a religious discrimination claim brought under Title VII). The legislative history supports this interpretation. *See* S.Rep. No. 101–116, at 36 (1989) ("The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), are not applicable to this legislation."); *see also* H. Rep. No. 101–485, pt. 2, at 68 (1990) ("By contrast, under the ADA, reasonable accommodation must be provided unless they rise to the level of 'requiring significant difficulty or expense' on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison*. This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities.")

claimants at U.S. Air, their seniority, or their need to be accommodated by exceptions to the seniority rules.[11] Mere speculation is insufficient to support summary judgment that the requested accommodation would impose undue hardship. We hold that a triable issue of fact exists.

## IV

Barnett claims that U.S. Air retaliated against him for his request for accommodation by placing him on involuntary job injury leave in January of 1993 and by terminating his salary continuance in February of 1993. The district court granted summary judgment to U.S. Air on this claim.

The ADA provides that: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). The ADA further makes it "unlawful to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

In order to resolve Barnett's retaliation claim, it is necessary to establish a framework for analyzing retaliation claims under the ADA. Most other circuits have adopted the Title VII framework for analyzing ADA retaliation claims. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999); *Talanda v. KFC National Management Co.*, 140 F.3d 1090, 1095 (7th Cir.1998); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir.1998); *Penny v. United Parcel Service*, 128 F.3d 408, 417 (6th Cir. 1997); *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir.1997); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997).

■ Adopting the Title VII framework incorporates a comprehensive body of law

analyzing workplace retaliation. This seems useful. Therefore, we join our sister circuits in adopting the Title VII retaliation framework for ADA retaliation claims.

■ To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) that he or she engaged in or was engaging in activity protected by the ADA, (2) the employer subjected him or her to an adverse employment decision, and (3) that there was a causal link between the protected activity and the employer's action. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987).

The district court concluded that Barnett failed to make out a prima facie case because he failed to demonstrate a causal connection between his request for accommodation and his involuntary placement on job injury leave. Barnett produced sufficient evidence to make a causal connection based on the temporal proximity of the adverse action and his request for reasonable accommodation. *See Id.* at 1376.

■ However, U.S. Air met its burden in offering a "legitimate non-retaliatory explanation for its [employment] decisions." *Id.* After receiving Barnett's request for accommodation, U.S. Air created a temporary limited duty position for him. After five months, U.S. Air put Barnett on job injury leave.

Barnett failed to raise a genuine issue of fact suggesting that U.S. Air's reason for putting him on job injury leave was a mere pretext. U.S. Air may have been mistaken as to its obligations under the ADA but it did keep Barnett in the limited duty position for twice the usual time. Absent evidence that U.S. Air's decision was for retaliatory reasons, Barnett's retaliation claim should not have survived summary judgment.

11. Interestingly, U.S. Air does provide an exception in its seniority system for catastrophic illness.

## V

We reverse the district court's summary judgment dismissal of Barnett's ADA discrimination claims. U.S. Air has failed to engage in good faith in the interactive process. U.S. Air should face liability for the remedies imposed by the statute if reasonable accommodation would be possible without an undue hardship to the company. Barnett's request to remain in the mail room was a reasonable accommodation absent proof of undue hardship and possible accommodations in the cargo facility may have been reasonable accommodations absent proof of undue hardship. Only a trial can resolve the factual dispute over whether reasonable accommodation can be made for Barnett. Therefore, Barnett's discrimination claims should be remanded to the district court for trial. The district court's summary judgment dismissal of Barnett's retaliation claims is affirmed.

AFFIRMED in part, REVERSED in part and REMANDED.

RONALD M. GOULD, Circuit Judge, with whom Circuit Judge THOMAS, joins, Concurring:

I concur in the court's excellent opinion, but set forth my views concerning the relationship between the demonstration of reasonableness and undue hardship. The court's opinion touches upon the relationship between reasonable accommodation and undue hardship. *See* Majority Op. at 1113 n. 4. I believe that a broader explication of this relationship is desirable.

Under the statute, a reasonable accommodation is one that will allow the employee to perform the essential functions of the job. An accommodation is reasonable if it will work for the employee. Reasonableness has nothing to do with the "difficulty or expense" that the employer will face in making the accommodation.

The ADA defines "reasonable accommodation" with examples of accommodations that self-evidently will assist people with various disabilities to perform the essential functions of their jobs. *See* 42 U.S.C. § 12111(9). Nothing in the definition refers to the employer or to the effect on the employer of providing such accommodation. *See* Steven Miller, *Disability Civil Rights and a New Paradigm for the Twenty-First Century: The Expansion of Civil Rights Beyond Race, Gender, and Age,* 1 U. Pa. J. Lab. & Employment L. 511, 519 (1998) (noting this distinction).

The statute's definition of "discrimination" supports this reading of "reasonable." The ADA defines discrimination as a failure to provide a reasonable accommodation unless doing so would result in undue hardship to the employer. Discrimination is: "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability ... unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Undue hardship is defined as "an action requiring significant *difficulty or expense,* when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. § 12111(10) (emphasis added). This definition expressly includes economic considerations and other difficulties for the employer.

We must read a statute to give effect to each word in it, so that none are superfluous. *See State v. Watkins,* 939 F.2d 710, 715 (9th Cir.1991). The word "reasonable" in 42 U.S.C. § 12112(b)(5)(A) must refer to something *other* than the effects of the difficulty or expense on the employer of providing an accommodation. The statute makes sense only if "reasonable" refers to the effects of the accommodation on the employee's ability reasonably to perform the essential functions of the job and does not include effects of difficulty or expense on the employer.

This relationship between the demonstration of reasonableness and undue hardship has several virtues. First, it fits the ADA structure and follows the ADA's text.

Second, it avoids the evident confusion in trying to give meaning to both "undue hardship" and "reasonable" if "reasonable" were to include the same effects on the employer as are considered in "undue hardship." And third, the employee can better determine what accommodation will work for him or her, while the employer has greater access to information about whether a particular accommodation will cause an undue hardship.

Under the statute's express terms, the "difficulty or expense" of an accommodation should not be considered in assessing "reasonable accommodation," but, rather, considered only in assessing "undue hardship."

O'SCANNLAIN, Circuit Judge, with whom Circuit Judges TROTT and KLEINFELD join, dissenting:

The sweeping language and exalted tone of the court's wide-ranging opinion make clear that it aspires to offer a definitive interpretation of the Americans with Disabilities Act (ADA). This might be less disturbing if this case actually involved an American with a disability. Because the court reaches out to decide several important issues of first impression in a case without a proper plaintiff, I must respectfully dissent.

I

Robert Barnett suffers from back problems. Barnett's doctor has imposed upon him permanent restrictions that prohibit him from excessive bending, twisting, and turning; prolonged standing or sitting; and lifting twenty-five pounds or more. Barnett claims that these restrictions prevent him from serving in the cargo position but do not prevent him from working in the swing-shift mailroom position. The functions of the mailroom position include occasional bending and frequent twisting and turning; occasional standing or sitting; and some lifting. The crucial limitation imposed upon Barnett, then, is the twenty-five pound lifting restriction, because it is the only restriction that would prevent him from handling cargo, but

would not prevent him from working in the mailroom.

The record evidence in this case clearly establishes that Barnett is not disabled within the meaning of the ADA. In *Thompson v. Holy Family Hospital,* 121 F.3d 537 (9th Cir.1997), we affirmed the summary judgment dismissal of an ADA case on the ground that the plaintiff failed to create a genuine issue of material fact as to her disability. Cynthia Thompson, like Robert Barnett, suffered from back problems, and her doctor, like Barnett's doctor, prohibited her from lifting more than twenty-five pounds. *See id.* at 539. The *Thompson* court found this limitation inadequate to establish a triable issue as to the plaintiff's disability. Although it acknowledged that lifting and working constitute "major life activities" for purposes of the ADA's implementing regulations, Thompson's twenty-five-pound lifting restriction did not constitute "the requisite evidence that she is substantially limited with respect to these activities." *Id.* at 539–40 (expressing agreement with "[a] number of courts [that] have held that lifting restrictions similar to Thompson's are not substantially limiting" (citing cases)). Although Thompson's lifting restriction prevented her from serving as a nurse performing "total patient care" duties, just as Barnett's identical lifting restriction prevented him from serving in the cargo position, the panel held that "[t]he inability to perform one particular job does not constitute [a substantial] limitation" on the general ability to work. *Id.* at 540.

The similarities between *Thompson* and the instant case, in terms of both the plaintiff's claimed disabilities and the employer's responses thereto, are striking. Under *Thompson,* it is clear that no genuine issue of material fact exists as to Barnett's disability. The district court's grant of summary judgment should be affirmed.

II

The court addresses (or dodges) the question whether Barnett is "disabled" un-

der the ADA in a footnote, noting in passing that the district court concluded that Barnett was "disabled" under the ADA and that U.S. Air did not raise the issue of Barnett's disability on appeal. Maj. op. at 1110 n. 1. The failure of U.S. Air to file a cross-appeal, however, in no way precludes us from affirming based on Barnett's failure to establish that he is disabled. Contrary to the suggestion in that footnote, it is well-settled that we may affirm a grant of summary judgment based on any ground supported by the record. *See, e.g.,* *Albertson's, Inc. v. United Food and Commercial Workers Union,* 157 F.3d 758, 760 n. 2 (9th Cir.1998); *Intel Corp. v. Hartford Accident and Indem. Co.,* 952 F.2d 1551, 1556 (9th Cir.1991). In *Intel,* the district court granted Intel's motion for summary judgment, holding, in part, that Hartford, which had issued an insurance policy to Intel, waived its reliance on one of the policy's exclusions. We affirmed the grant of summary judgment, but on a different ground. We examined the policy's exclusion, and held that there was no material issue of fact as to the exclusion's application. *See id.* at 1561.

Although U.S. Air did not present the issue of Barnett's disability (or lack thereof) in a separate appeal, the parties have had more than ample opportunity to brief and to argue the issue in both the district court and this court. Before the district court, U.S. Air argued that Barnett's lifting restrictions did not render him disabled under the ADA; Barnett opposed granting summary judgment on that basis. In a fairly brief discussion, the district court determined that summary judgment could not be properly granted on the issue because of evidence showing Barnett's back injury to be "serious and permanent."

On August 26, 1996, Barnett filed his notice of appeal in our court; U.S. Air did not file a cross-appeal.[1] One year later, on August 8, 1997, we decided *Thompson.* In our order filed September 16, 1997, we specifically directed the parties to file sup-plemental briefs discussing *Thompson.* These briefs were filed in advance of oral argument before the three-judge panel, held on October 8, 1997.

In both the district court and this court, the parties have had the opportunity to develop, and have actually developed, the issue of Barnett's disability, both before, and in light of, *Thompson.* As a result, nothing bars us from taking the prudential path and refraining from deciding weighty issues in a weightless case. *Cf. Bellotti v. Baird,* 428 U.S. 132, 143–44, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). In *Bellotti,* the Court held that the district court should have abstained from deciding a constitutional issue, stating that, "It is not entirely clear that appellants suggested the same interpretation in the District Court as they suggest here. Nevertheless, the fact that full arguments in favor of abstention may not have been asserted in the District Court does not bar this Court's consideration of the issue." *Id.* at 143 n. 10, 96 S.Ct. 2857 (internal citation omitted). *Cf. Delange v. Dutra Const. Co.,* 183 F.3d 916, 919 n. 3 (9th Cir.1999) (recognizing that this circuit may exercise its discretion to review issues raised for the first time on appeal).

### III

Barnett's case simply cannot bear the weight that the court seeks to place upon it. A case so transparently lacking in merit is an inappropriate vehicle for deciding multiple questions of first impression concerning the proper construction of an important statute (and creating a circuit split in the process, *see* maj. op. at 1118 n. 8). The court has issued what in effect amounts to a lengthy advisory opinion on the ADA; when this case returns to the district court, the only appropriate course of action will be to dispose of it under *Thompson.*

---

1. The fact that *Thompson* was decided well after the time for U.S. Air to file a notice of appeal had passed may explain in part U.S. Air's failure to take a cross-appeal.

Because Barnett is simply not disabled under the ADA, the district court's grant of summary judgment was proper and should be affirmed. I respectfully dissent.

TROTT, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and KLEINFELD join, dissenting:

In taking this case en banc, we ordered that our deceased colleague Judge Charles Wiggins's panel opinion be vacated. With all respect, I cannot agree with the majority's new opinion for our court, and because I am unable to improve on Judge Wiggins's analysis of the important seniority system issue in this case, I republish here his excellent analysis from his extirpated work.

Moreover, I am troubled by the regrettable position in which we leave employers, employees, and the lawyers who advise them in connection with these important and possibly costly decisions. To require them to deal with a seniority system as "merely one factor" leaves them with no guidance, none at all. This default portends litigation in every case where a seniority system blocking the accommodation is respected, and even possibly in cases where it is not, brought in that instance by aggrieved persons earlier in line for the job.

What to do with seniority systems in this context is a policy question for Congress, one which we as judges have no authority or ability to resolve. We are left with legislation by litigation, and we become a nation not of laws, but of lawyers. In any event, forced to decide, I go with Judge Wiggins, and I express posthumously my thanks for his usual clear vision and remarkable service to our court. Here is how he saw it.

The ADA's ambiguous legislative history is of little help in determining whether seniority policies should be treated the same under the ADA and the Rehabilitation Act. On one hand, there is evidence that Congress considered seniority rights to be merely one factor in reasonable accommodation analysis under the ADA,

rather than a dispositive factor. *See* S.Rep. No. 101–116, at 32 (1989) ("The collective bargaining agreement could be relevant, however, in determining whether a given accommodation is reasonable. For example, if a collective bargaining agreement reserves certain ·jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to that job.") H.R.Rep. No. 101–485, pt. 2, at 63 (1990) (same language), *reprinted in* 1990 U.S.C.C.A.N. 303, 345. On the other hand, the House and Senate Reports also state that reasonable accommodation does not require "bumping" a more senior employee to create a vacancy (although if the employer chose to do so, such bumping would constitute reasonable accommodation). *See* S.Rep. No. 101–116, at 32 (1989); H.R.Rep. No. 101–485, pt. 2, at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 345.

In the face of this ambiguity, I am persuaded by well-reasoned opinions from other circuits that have concluded that the ADA does not require an employer to give disabled employees preference over nondisabled employees in hiring and reassignment decisions. But this is precisely what Barnett requests. U.S. Air's seniority system is a decades-old system that controls the duty assignments, shifts, transfers, holidays, etc. of U.S. Air's approximately fourteen thousand customer service agents. Barnett does not claim that U.S. Air's policy is illegitimate and an excuse for unlawful discrimination. But Barnett does claim that U.S. Air should have left him in the mailroom position, thus excepting him from its seniority policy, because of his disability. Although many ADA cases have held that reasonable accommodation does not require exempting a disabled employee from a collectively bargained seniority system, *see, e.g., Foreman v. Babcock & Wilcox, Co.,* 117 F.3d 800, 810 (5th Cir.1997); *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 912–13 (7th Cir. 1996); *Eckles v. Consolidated Rail Corp.,*

94 F.3d 1041, 1051 (7th Cir.1996) (adopting a "per se" rule that reasonable accommodation does not require "sacrificing the collectively bargained, bona fide seniority rights of other employees"); *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1114 (8th Cir.1995), Barnett argues that his case is different because U.S. Air's seniority policy is not the result of a collective bargaining agreement. I reject this argument and agree with a Fifth Circuit panel that, in dicta, found Barnett's claimed distinction to be irrelevant. In *Foreman v. Babcock Wilcox Co.,* 117 F.3d 800 (5th Cir.1997), the Fifth Circuit rejected a disabled employee's claim that the ADA required his employer to reassign him to a new position even in the face of a collectively bargained seniority provision that would prohibit the requested transfers. The Court rejected the employee's argument, making clear that its decision was not based on the special status of collective bargaining agreements.

> [E]ven if there were no CBA in place, B & W would not be obligated to accommodate Foreman by reassigning him to a new position. "[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less."

*Foreman,* 117 F.3d at 810 (quoting *Daugherty v. City of El Paso,* 56 F.3d 695 (5th Cir.1995)).

I agree with the *Daugherty* court and the other circuits that have interpreted the ADA as requiring no more than equality among disabled and nondisabled employees in hiring and reassignment decisions. This principle was well articulated by a recent Seventh Circuit panel:

> While Congress enacted the ADA to establish a "level playing field" for our nation's disabled workers, it did not do so in the name of discriminating against persons free from disability. Restated, the ADA does not mandate a policy of "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."

*Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 700 (7th Cir.1998) (quoting *Daugherty,* 56 F.3d at 700); *see also Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 679 (7th Cir.1998) ("[W]e have been unable to find a single ADA or Rehabilitation Act case in which an employer has been required to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer, and for good reason. The contrary rule would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees.") (internal citations omitted); *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384–85 (2d Cir.1996) ("Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons."); *Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1225 (11th Cir.1997) ("We are aware of no case under either the ADA or the Rehabilitation Act where an employer has been required to transfer an employee to another position where the employer (independent of concerns about disability) has a business policy against the pertinent kind of transfer.") *But see Aka v. Washington Hospital Center,* 156 F.3d 1284, 1305 (D.C.Cir.1998) (en banc) (noting that "[a]n employer is not required to reassign a disabled employee in circumstances 'when such transfer would violate a legitimate, nondiscriminatory policy of the employer,' " but also arguing against the dissent's claim that the ADA "mandat[es] nothing

more than that the employer allow the disabled employee to submit his application along with all of the other candidates.").

Because Barnett's proposed accommodation would violate U.S. Air's legitimate seniority policy, I find that the proposed accommodation is unreasonable under the ADA.