FILED

OCT 3 2013

NOT FOR PUBLICATION

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re:<br><br>GROTH BROTHERS OLDSMOBILE,<br>INC., dba Groth Brothers<br>Chevrolet,<br><br>           Debtor.<br>_____<br>GROTH BROTHERS OLDSMOBILE,<br>INC.,<br><br>           Appellant,<br><br>v.<br><br>JOHN T. KENDALL, TRUSTEE;<br>GREEN VALLEY CORPORATION;<br>BORDONI RANCH, LLC,<br><br>           Appellees.<br>_____ | BAP No. NC-12-1482-DJuPa<br><br>Bk. No. 11-45396-RLE<br><br><br><br><br><br><br>**M E M O R A N D U M**[1] |

Argued and Submitted on September 20, 2013
at San Francisco, California

Filed – October 3, 2013

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Roger L. Efremsky, Bankruptcy Judge, Presiding

Appearances:    William L. Needler argued for himself and Appellant William F. Ghiringhelli; Johnson C. W. Lee argued for Appellee John T. Kendall, chapter 7 trustee.

Before:  DUNN, JURY and PAPPAS, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Sorting out the parties in this appeal requires an explanation.  Although this appeal is captioned with Groth Brothers Oldsmobile, Inc. ("Groth") as the appellant, Groth is currently a chapter 7[2] debtor, and its role in this appeal is purely passive.  The active appellants are William L. Needler of Needler Law P.C. ("Needler") and William F. Ghiringhelli of the Law Offices of William F. Ghiringhelli ("Ghiringhelli"), who are appealing the bankruptcy court's denial of their employment nunc pro tunc as Groth's chapter 11 counsel.  (Needler and Ghiringhelli are collectively referred to herein as Appellants.)  Likewise, although John T. Kendall, the chapter 7 trustee for Groth ("Trustee"), Green Valley Corporation ("Green Valley") and Bordoni Ranch, LLC ("Bordoni Ranch") all are listed as appellees, only the Trustee has participated actively in this appeal.  We AFFIRM.

## I.   FACTUAL BACKGROUND

At the outset, we are concerned that the Appellants did not provide us with a complete or adequate record in this appeal.  It is the appellant's burden generally to provide a record that is adequate for purposes of appellate review.  See, e.g., Rule 8009(b); Kritt v. Kritt (In re Kritt), 190 B.R. 382, 387 (9th Cir. BAP 1995).  We particularly are concerned that

---

[2] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  The Local Rules of the District Court for the Northern District of California are referred to as "LR's" and the Local Rules for the Bankruptcy Court for the Northern District of California are referred to as "LBR's."

-2-

Appellants did not provide us with a number of documents from the record that were filed in opposition to their positions taken before the bankruptcy court.  See Burkhart v. FDIC (In re Burkhart), 84 B.R. 658, 661 (9th Cir. BAP 1988) ("Appellants should know that an attempt to reverse the trial court's findings of fact will require the entire record relied upon by the trial court be supplied for review.").  Fortunately, the Trustee has supplied sufficient missing documents that we can conduct a meaningful review in this appeal.[3]

A.  Groth's operations preceding its bankruptcy filing.

Some understanding of Groth's history and the difficulties it encountered leading up to and following its bankruptcy filing is necessary to provide context for the issues raised in this appeal.  Groth Brothers Oldsmobile, Inc. dba Groth Brothers Chevrolet was established and had been operating as a Chevrolet Automotive Dealer in Livermore, California since 1934.  Unfortunately, like many other automobile dealerships, Groth suffered a significant downturn in its business during the recession of recent years.  At some point in 2010, Groth lost its flooring line of credit with General Motors Acceptance Corporation ("GMAC").  Without credit from GMAC, Groth was unable to secure financing to acquire new automobile inventory.  In

---

[3] The Trustee also argues that this appeal should be dismissed for Appellants' late filing of their opening brief after two extensions had been granted.  See Trustee's Brief at 10.  Appellants' Opening Brief ultimately was filed five days after the second granted extension expired.  We exercise our discretion to waive that procedural defect and proceed to consider the substance of this appeal.

order to acquire a limited supply of new vehicles, Groth depended for a time on loans from its owners. However, by the time of its bankruptcy filing, Groth's operations were essentially limited to the operations of its service department and body shop and sales of vehicles on consignment.

B. Groth's short sojourn in chapter 11.

Groth filed its petition under chapter 11 on May 18, 2011. In its original filed schedules, Groth listed personal property assets with a total asserted value of $2,579,501.43, including $2,000,000 for Groth's Chevrolet Automobile Franchise. The only secured debt listed was a $359,324.52 Internal Revenue Service ("IRS") lien that Groth questioned as a potential preference. However, Groth listed other tax debt on its Schedule E totaling $877,818.71, including $738,901.78 of additional debt to the IRS. General unsecured debts listed in Groth's Schedule F totaled $2,426,344.98. In its Statement of Financial Affairs ("SOFA"), Groth listed payments to its owners and their relatives totaling $436,763.64 during the year preceding its bankruptcy filing.[4]

Groth filed a proposed plan of reorganization ("Initial Plan") along with its petition. However, in the Article of the Initial Plan titled "Means and Execution of the Plan," Groth merely stated that it would "continue its sale of new and used cars and continue to operate its body shop and extensive service facilities" while it investigated selling its dealership franchise.

---

[4] Amended schedules and an amended SOFA were filed on June 5, 2011, but the amendments did not change the information set forth above from the original schedules and SOFA.

-4-

Following the § 341(a) meeting, the bankruptcy court held a status conference ("Status Conference") in the case on June 28, 2011. At the Status Conference, Needler appeared in behalf of Groth and advised the bankruptcy court that, "We're operating in the black," and Groth was investigating both a potential sale of the dealership franchise and obtaining new floor financing. Needler further reported,

> I think we can have a workable, feasible plan on file by 60 days. We may precede that with a [sale] motion under [section] 363, which would be an avenue to get this thing moving faster.

June 28, 2011 Hr'g Tr. at 4:16-19.

Counsel for the United States Trustee ("UST") saw things very differently. Based on information received from Groth's principal at the initial debtor interview and the § 341(a) meeting, the UST's understanding was that Groth was operating "at about a $30,000-a-month loss." Only nine cars were left in inventory. Groth was not making lease payments for its facilities, and it was not making current contributions to its union pension plan. The UST was preparing a motion to convert the case.

> I know that Mr. Needler believes that the debtor needs to sell it in Chapter 11. And I think that they need to do that very, very quickly, if just to get that done before a hearing on a motion to convert because there's no – there's no possibility of reorganization here.

June 28, 2011 Hr'g Tr. at 165:20-24.

At the Status Hearing, Needler also gave the bankruptcy court a preview of potential floor financing for Groth.

> I basically have a letter of intent. It's at 14- to 16-percent interest. It provides for us to borrow $2.5 million for a floor plan, of which a hundred

vehicles would be used, 50 vehicles would be new. The problem is . . . that the fee, the upfront fee involved is roughly $75,000. So I'm not sure that Your Honor would approve of such a floor plan, but it's the only [one] that we've been able to come up with.

June 28, 2011 Hr'g Tr. at 169:17-24. Needler further conceded that Groth's schedules did not support an ability to reorganize. The potential for reorganization would depend on the value of Groth's dealership franchise.

The UST filed a motion to convert or dismiss ("Conversion Motion") Groth's chapter 11 case on July 11, 2011. The reasons given in support of the Conversion Motion included the following:

1) Groth had lost its floor financing from GMAC in March 2010 and had not been able to obtain replacement floor financing.

2) Groth reported only $21,680 in available cash on its Schedule B, its cash having been depleted by distributions to insiders for repayment of unsecured loans, compensation and dividends/draws. In item 3(c) of its SOFA, Groth reported that it had made payments to five insiders totaling $436,763 in the year preceding its bankruptcy filing.

3) Groth's President Robin Groth-Hill had consistently paid herself a weekly salary of $2,600 but had recharacterized the payments as credits against her loans to Groth, consequently not paying payroll tax on her compensation and not accounting for these payments as wages for income tax purposes.

4) A judgment for $387,489, that was being appealed, had been entered against Groth in union litigation on May 12, 2011. However, in addition to the judgment, Groth owed the union's pension plan $1.3 million for Groth's share of unfunded pension liabilities.

-6-

5) Groth admitted owing $1,237,143 in tax liabilities to state and federal taxing authorities in its schedules. Groth further had failed to pay payroll tax payments to the IRS and the state of California since 2009.

6) Groth's monthly operating losses in chapter 11 would exceed $40,000.

Based on the foregoing, the UST argued that Groth was incurring substantial continuing losses from operations and diminution of the estate and had no reasonable likelihood of reorganizing its affairs in chapter 11.

On July 24, 2011, Groth filed an emergency motion ("Financing Motion") to approve floor financing and a capital loan ("Emergency Financing"). Attached as "Group Exhibit A" to the Financing Motion was a letter agreement for the Emergency Financing. According to its terms, the Emergency Financing totaled $3,000,000, $2,500,000 for floor financing and $500,000 for working capital, bearing interest at 12% per annum, maturing in twelve months, with a possible six months extension. The loan fee would be $65,000. In addition, the lender would receive a warrant to purchase up to 20% of Groth's outstanding stock "for a nominal price," $0.01 per share, that Groth would be able to repurchase from the lender for up to one year following its reorganization in chapter 11 for $50,000, so long as any outstanding portion of the working capital loan component of the Emergency Financing was paid in full at the same time. Needler characterized the warrant as, "It's really – it's really 20 percent, really, for nothing. That's really what it is." July 27, 2011 Hr'g Tr. at 226:21-22.

-7-

A hearing ("Financing Hearing") on Groth's Financing Motion was held on July 27, 2011. General Motors, LLC ("GM") objected to the Emergency Financing proposal based on the 20% equity transfer provided for in the letter agreement and warrant. Counsel for GM noted that its dealer agreement with Groth provided that any ownership transfer was subject to GM's approval. GM was not familiar with the new proposed lender/equity holder and had "no basis to consider let alone approve" the proposed equity transfer. In addition, GM argued that the letter agreement for the Emergency Financing was deficient in that it did not specify line of credit arrangements with a financial institution that GM would be allowed to draw against as it supplied vehicle inventory.

Noting that there was no evidentiary support for the Financing Motion in terms of supporting declarations, the bankruptcy court denied the Financing Motion.

> But to say that you want to approve this deal, with no evidence to support it, you're going to take a $3 million loan out, you're going to pay it back in a year at 12 percent interest, you're paying $65,000 upfront, and you're effectively giving 20 percent of the business away, or $400,000 if the value is $2 million, without doing a notice of sale and then complying with the Guidelines? No. And so I'm saying – all I'm going to say today is the motion is denied and I'm going to leave it at that.

July 27, 2011 Hr'g Tr. at 230:19-25; 231:1-2.

Groth filed its opposition ("Opposition") to the Conversion Motion on August 10, 2011. Noting the denial of its Financing Motion, Groth stated that it had negotiated an agreement to sell its business to Green Roads, L.L.C. ("Green Roads"), for $1,600,000, $1,000,000 for its dealership franchise and $600,000

-8-

for the balance of its assets. Groth argued that, as the primary owners of Green Roads already owned a Chevrolet dealership, Groth did not expect any difficulty in securing GM's approval for the sale. Part of the proposed deal, "to provide future incentives," would be to give a total 30% equity interest in Green Roads to two Groth insiders, Robin Groth-Hill, Groth's President, and David Groth, who managed Groth's body shop. Groth hoped to file a motion to approve the proposed sale within the next five days and further hoped that the motion could be heard on an expedited basis. In conjunction with the proposed sale, Groth would be filing a liquidating plan shortly.

Groth argued that its proposed sale would be in the best interests of its creditors and the estate because it would preserve value for the dealership franchise that otherwise would be lost in a chapter 7 liquidation. Groth did not contest the UST's arguments that Groth was experiencing substantial continuing losses and diminution of the estate postpetition. However, it argued that its projected sale and liquidating plan satisfied the reorganization objective of chapter 11, maximizing the distributions that would be available to creditors.

The UST filed a reply ("Reply") to the Opposition on August 17, 2011. At the outset, the UST noted that the promised sale motion had not been filed by Groth. The UST further noted that from its filed monthly operating reports, Groth's financial condition was deteriorating, and it was unable to pay its postpetition financial obligations.

Groth filed an emergency motion ("Sale Motion") to sell its dealership franchise and all other assets free and clear of liens

under § 363 on August 19, 2011. As indicated in the Opposition, the proposed sale was to Green Roads for $1,600,000. The Sale Motion was supported by a copy of a nonbinding letter of intent, attached as Exhibit 2 to the Sale Motion. Needler's supporting declaration advised that counsel for the principal of Green Roads was contacting GM to obtain tentative approval for the proposed sale. Both the Sale Motion and Needler's declaration advised that Robin Groth-Hill and David Groth would receive a 30% equity ownership interest in Green Roads.

On August 19, 2011, the UST opposed the Sale Motion on the following grounds:

1) Under Rule 2002(a), a proposed sale of estate property outside the ordinary course of business must be noticed to all creditors of the estate. Groth noticed only its list of twenty largest creditors.

2) Throughout the case, Groth had maintained that its business was worth at least $2 million; yet, the proposed sale was for only $1.6 million. On its face, there was no explanation for the lower price, except that insiders of Groth were to receive a 30% equity interest in the proposed buyer. The expedited consideration of the Sale Motion requested by Groth would not allow for sufficient investigation of the proposed sale transaction by interested parties.

On August 22, 2011, Groth filed a further memorandum in support of the Sale Motion. While side-stepping the notice issue raised by the UST, Groth urged the proposed sale as supported by good business reasons, i.e., it would allow for continued employment of Groth's employees, would include payment of

$1 million for "Blue Sky" (Groth's dealership franchise), and would include an additional $600,000, which nearly approximated the value for Groth's other assets as stated in its schedules. On August 23, 2011, Groth filed its amended plan of reorganization, incorporating the proposed $1.6 million sale to Green Roads. On the same date, Groth also filed an amended certificate of service, reflecting service of the Sale Motion on all parties with addresses on Groth's mailing matrix on August 19, 2011.

Groth requested an expedited hearing on the Sale Motion. Groth's motion for expedited hearing was denied by order entered on August 19, 2011.

On August 23, 2011, the bankruptcy court held a hearing ("Conversion Hearing") on the Conversion Motion and granted the motion. Neither of the Appellants nor any other representative of Groth appeared at the Conversion Hearing. At oral argument, Needler advised that he had tried, but had been unable to connect to the Conversion Hearing by telephone.

An order converting Groth's chapter 11 case to chapter 7 was entered on August 24, 2011. The Amended Report of Unpaid Chapter 11 Debtor-in-Possession Expenses, filed by Needler on September 16, 2011, reflected the following unpaid postpetition expenses of Groth, totaling $458,296.09 as of the conversion date: a) wages and vacation pay – $62,987.82; b) unsecured vendor payables – $261,518.27; and c) unpaid taxes – $133,790.00. The conversion order was not appealed.

///

///

-11-

C. Appellants' efforts to obtain approval of employment as Groth's chapter 11 counsel.

On May 23, 2011, Needler filed his application for pro hac vice admission that was approved by order entered on May 26, 2011.

Groth filed an application to employ Needler as its lead attorney in the chapter 11 case, supported by Needler's declaration, on May 27, 2011. In his Disclosure of Compensation, Needler disclosed a retainer of $45,000. In its SOFA, Groth stated that prepetition, it had paid Needler $20,000 "against a Corporate Retainer of $45,000 plus $1,039 Filing Fee."

On June 3, 2011, the UST objected to Needler's employment application on the following grounds: 1) The application made no statement as to whether Needler had any prepetition ties to Groth. 2) No application of Ghiringhelli for employment as Needler's local co-counsel had been filed. 3) A copy of Needler's Retainer Agreement with Groth was not attached to the application. 4) The application did not adequately describe funds received from Groth and the financial terms for Needler's employment. 5) After citing three prior disgorgement orders directed against Needler in other cases, the UST wanted an explanation as to "why out of state counsel is necessary in this case, how travel expenses would be dealt with and why his employment would benefit the estate given his past performance in other cases." 6) Needler did not serve a copy of his proposed employment order on the UST.

Ghiringhelli's application for employment as Groth's co-counsel was filed on June 19, 2011. In his application for

-12-

employment, supported by his declaration, Ghiringhelli advised that while he had no experience in chapter 11 matters, he was a CPA, and he previously had represented Groth with regard to other legal issues, including tax matters.  He further advised that he was a disinterested person and did not represent any interests adverse to Groth.

At the Status Conference, the bankruptcy court noted that Needler's employment application was scheduled for hearing the following day, but the bankruptcy court would not approve his employment until California co-counsel was approved as well.  Accordingly, Needler needed to tie his application for employment in with Ghiringhelli's, and both should be set for hearing together.  Needler agreed to continue the hearing on his employment application.

On June 30, 2011, the UST objected to Ghiringhelli's employment application, incorporating by reference its objections to Needler's application, but also objecting based on Ghiringhelli's failure to include a copy of his retainer agreement with the application, and Ghiringhelli's further failure to submit a proposed order.

On July 24, 2011, Ghiringhelli filed his "ATTORNEY-CLIENT FEE CONTRACT."

Needler's employment application was on the calendar for consideration at the Financing Hearing, but the bankruptcy court noted that Ghiringhelli's employment application, which had been objected to by the UST, had not been scheduled for hearing.  The bankruptcy court reiterated what it had stated at the Status Hearing, namely that it would not approve Needler's employment

until the employment of his California co-counsel was approved. Accordingly, the bankruptcy court suggested that both employment applications be set for hearing at the same time, and in the meantime, Needler could talk with the UST in the hope that any issues as to employment approval could be resolved. Needler subsequently filed an "emergency" motion to have his and Ghiringhelli's employment applications heard together on August 10, 2011. The hearing on Needler and Ghiringhelli's employment applications and the UST's objections thereto was scheduled for August 24, 2011 at 2:00 pm.

Ghiringhelli filed an amended employment application, advising that his representation of Groth would be limited to questions of state law and tax law, on August 15, 2011. In the meantime, the UST had filed an amended objection to Ghiringhelli's employment application on August 2, 2011.

As noted above, the UST's Conversion Motion was granted on August 23, 2011, and the August 24, 2011 hearing on Needler and Ghiringhelli's employment applications was removed from the calendar.

On September 3, 2011, Needler filed a motion ("Reconsideration Motion") to "reconsider, amend, modify and vacate" the bankruptcy court's decision to cancel the hearing on Needler and Ghiringhelli's applications for approval of employment. Needler asserted that removing the hearing on the employment applications from the calendar was unfair, and his and Ghiringhelli's employment applications should be approved nunc pro tunc to Groth's chapter 11 filing date, May 18, 2011, effective immediately. The UST opposed the Reconsideration

-14-

Motion, essentially arguing that nothing in the Reconsideration Motion and its supporting papers adequately refuted the UST's filed objections to the employment of Needler and Ghiringhelli.

Needler filed a supplemental memorandum in support of the Reconsideration Motion, setting forth in detail the efforts Needler and Ghiringhelli had made to obtain employment as Groth's chapter 11 counsel and focusing on his experience in various federal courts and in representing multiple automotive dealerships in chapter 11 bankruptcy proceedings.

The bankruptcy court held a hearing ("Reconsideration Hearing") on the Reconsideration Motion on October 12, 2011. At the Reconsideration Hearing, the bankruptcy court emphasized that it never had ruled on Needler and Ghiringhelli's employment applications. The scheduled hearing on the employment applications simply had been taken off calendar as a result of the conversion of Groth's chapter 11 case. "So there is no order to vacate, modify or reconsider at this juncture." October 12, 2011 Hr'g Tr. at 4:8-9. The bankruptcy court went on to deny the Reconsideration Motion without prejudice, referring Needler to the Ninth Circuit's decision in Atkins v. Wain, Samuel & Co. (In re Atkins), 69 F.3d 970 (9th Cir. 1995), as setting forth the factors that Needler would need to address in moving for nunc pro tunc approval of the employment applications. The bankruptcy court then advised that such a motion should be set for hearing on appropriate notice.

On January 29, 2012, Needler filed an application for approval of fees and expenses as a chapter 11 administrative expense in Groth's chapter 7 case. Needler requested fees of

-15-

$115,978.32 and reimbursement of expenses of $8,310.35, for a total of $124,288.67. Needler later increased his request for approval of fees and costs by $52,826.94, for an ultimate total request of $177,115.61.

Needler filed a motion for rehearing ("Rehearing Motion") of Needler and Ghiringhelli's applications for employment as Groth's chapter 11 counsel nunc pro tunc to the petition date on January 30, 2012. In the Rehearing Motion, Needler requested the bankruptcy court to reconsider its action in removing the August 24, 2011 hearing on Needler and Ghiringhelli's applications for employment from the calendar and "[f]or such other and further Relief as is just and Equitable under the circumstances." As support for the Rehearing Motion, Needler refiled the Reconsideration Motion with its supporting papers. On February 7, 2012, Needler filed a memorandum ("Rehearing Memorandum") in further support of the Rehearing Motion. In the Rehearing Memorandum, Needler recapitulated Groth's history in bankruptcy. He went on to compare the underlying facts in the Ninth Circuit's Atkins decision and certain facts in the Groth case, and he addressed at length the standards for consideration of nunc pro tunc employment of professionals set forth in the Atkins decision and in In re Twinton Props. P'ship, 27 B.R. 817 (Bankr. M.D. Tenn. 1983), discussed at length in Atkins.

On February 21, 2012, the Trustee filed his opposition ("Rehearing Opposition") to the Rehearing Motion. In the Rehearing Opposition, the Trustee primarily argued that 1) Needler and Ghiringhelli had not adequately established "exceptional circumstances" for their failure to obtain prior

approval of their employment applications, and 2) they had not demonstrated that their services significantly benefitted Groth's estate, both as required by Atkins. Green Valley and Bordoni Ranch joined in the Opposition.

On February 29, 2012, the bankruptcy court held a hearing ("Preliminary Hearing") on the Rehearing Motion and Needler's application for approval of fees and reimbursement of expenses. At the Preliminary Hearing, during colloquy with counsel, the bankruptcy court advised Needler that the standards for nunc pro tunc approval of employment, "whether there's a satisfactory explanation for the delay in obtaining approval and then also a demonstration of benefit," had not been met. February 29, 2012 Hr'g Tr. at 4-5. The bankruptcy court went on to deny the Rehearing Motion without prejudice and the fee application as premature, again without prejudice. An order consistent with the bankruptcy court's oral rulings at the Preliminary Hearing was entered on March 6, 2012.

On August 13, 2012, over five months later, Needler filed a motion ("Further Rehearing Motion") for a further rehearing of the Rehearing Motion and for the entry of final orders on his motion for nunc pro tunc approval of his and Ghiringhelli's employment as chapter 11 counsel for Groth and on Needler's final application for allowance of fees and expenses. Needler relied on his prior motions, memoranda, applications and declarations in support of the Further Rehearing Motion and on a further memorandum, readdressing Needler's understanding of the Atkins and Twinton Properties standards for nunc pro tunc approval of professional employment.

On August 28, 2012, the Trustee filed his renewed opposition ("Renewed Opposition"). The Trustee focused on the lack of any demonstration of significant benefit to the estate in Needler's papers. As to Needler's application for approval of fees and reimbursement of expenses, the Trustee argued that no payment to Needler was appropriate unless and until an order for his employment was entered. The fee application also was defective in that it had only been noticed to the twenty largest unsecured creditors rather than to the entire body of Groth's creditors. Accordingly, the fee application should be denied as premature and improperly noticed. Green Valley and Bordoni Ranch again joined in the Trustee's Renewed Opposition.

Needler responded to the Renewed Opposition on September 4, 2012. In addition to revisiting the history of Needler's and Ghiringhelli's efforts to obtain approval of their employment as Groth's chapter 11 counsel, Needler argued that through "the continued Court instituted delays," his and Ghiringhelli's constitutional due process rights were violated. Needler also discussed services that he performed in the Groth chapter 11 case that were essential to the bankruptcy process so that there actually were assets for the Trustee to administer and sell. Needler again referenced his prior work on chapter 11 automotive dealership cases in other jurisdictions in support of his and Ghiringhelli's employment applications.

On September 5, 2012, the bankruptcy court held its final hearing ("Final Hearing") on Needler and Ghiringhelli's applications for nunc pro tunc employment as Groth's chapter 11 counsel and Needler's final fee application. After hearing

-18-

argument from Needler and counsel for the Trustee, the bankruptcy court 1) adopted the points made in the Renewed Opposition; and 2) incorporated its previous rulings denying Needler and Ghiringhelli's applications for employment and Needler's fee application. The bankruptcy court found that the "exceptional circumstances" required by Atkins to justify nunc pro tunc approval of professional employment had not been demonstrated in this case. The bankruptcy court denied the Further Rehearing Motion with prejudice. On September 17, 2012, the bankruptcy court entered an order denying with prejudice Needler and Ghiringhelli's applications for nunc pro tunc employment as Groth's chapter 11 counsel and further denying with prejudice Needler's final application for allowance of fees and reimbursement of expenses.

On September 16, 2012, Appellants filed a notice of appeal from the bankruptcy court's oral rulings at the Final Hearing. Appellants filed an amended notice of appeal on September 24, 2012.

## II.   JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III.   ISSUES

The Appellants feel mightily aggrieved by the bankruptcy court's denial of their applications for employment as Groth's chapter 11 counsel, and that sense of grievance is reflected in their statement of ten issues, some with multiple subparts, over six pages in their opening brief. See Appellants' Opening Brief

at 3-8.  We limit our consideration to the relevant issues actually argued in Appellants' Opening Brief, stated as follows. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001) ("[I]ssues which are not specifically and distinctly argued and raised in a party's opening brief are waived."), citing Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1110 n.1 (9th Cir. 2000) (en banc).

1.  Did the bankruptcy court abuse its discretion in declining to consider Needler's application for employment until his local California co-counsel was employed?

2.  Did the bankruptcy court abuse its discretion in denying Appellants' nunc pro tunc applications for employment as Groth's chapter 11 counsel after Groth's bankruptcy case had been converted to chapter 7?[5]

3.  Did the bankruptcy court abuse its discretion in denying compensation and reimbursement of expenses to Needler?

## IV.   STANDARDS OF REVIEW

A bankruptcy court's interpretation and application of its

---

[5] In light of the early filing of Needler's application for employment, less than a week after Groth's chapter 11 filing, and the filing of Ghiringhelli's application approximately three weeks later, it is not clear to us exactly when it became appropriate or necessary for Appellants to request nunc pro tunc approval of their employment as Groth's chapter 11 counsel. Apparently, Needler first raised the issue in the Reconsideration Motion, filed after Groth's chapter 11 case had been converted to chapter 7.  In any event, in all proceedings thereafter, the parties and the bankruptcy court operated under the assumption that Appellants' employment applications should be considered for nunc pro tunc approval under the Atkins standards.  That is how the issues in this appeal have been briefed, and that is how we consider them.

local rules is reviewed for an abuse of discretion. See United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009). A bankruptcy court's consideration of an application for nunc pro tunc approval of professional employment also is reviewed for abuse of discretion. See In re Atkins, 69 F.3d at 973. Finally, a bankruptcy court's denial of a motion for reconsideration likewise is reviewed for abuse of discretion. Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1100 (9th Cir. 2004); Branam v. Crowder (In re Branam), 226 B.R. 45, 51 (9th Cir. BAP 1998).

A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard, or its factual findings are illogical, implausible or without support from evidence in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011). Only if the bankruptcy court did not apply the correct legal standard, or if its fact findings were illogical, implausible, or without support in inferences that can be drawn from facts in the record, is it proper to conclude that the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the bankruptcy court's view of "the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985).

-21-

We may affirm on any basis supported by the record. <u>Shanks v. Dressel</u>, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V. DISCUSSION

A. <u>The bankruptcy court did not abuse its discretion in declining to consider Needler's employment as Groth's chapter 11 counsel until Ghiringhelli's employment as local co-counsel had been approved or set for hearing in conjunction with Needler's employment application.</u>

Appellants argue at length in their opening brief that they met the standards for employment as estate professionals under § 327(a), and the bankruptcy court erroneously thwarted Groth's selection of its chapter 11 counsel by delaying consideration of their employment applications based on objections of the UST. <u>See</u> Appellants' Opening Brief at 18-32. However, these arguments ultimately are beside the point because the reason for delays in considering the substance of the Appellants' employment applications prior to the conversion of Groth's case resulted from the delay in filing Ghiringhelli's employment application and a further delay in setting Ghiringhelli's employment application for hearing with Needler's after the UST had objected to Ghiringhelli's employment.

LBR 9010-1(a) provides that, "A corporation, partnership, or any entity other than a natural person may not appear as a . . . debtor in a bankruptcy case <u>except through counsel admitted to practice in this District</u>." (Emphasis added.) LBR 9010-1(b) further provides that, "A corporation, partnership, or any entity other than a natural person may not serve as a debtor-in-possession in a Chapter 11 case unless represented by counsel." As recognized by Appellants, LR 11-3(a)(3), incorporated in the LBR's by reference in LBR 1001-2(a), required for Needler's pro

hac vice admission, "That an attorney, identified by name and office address, <u>who is a member of the bar of this Court in good standing and who maintains an office within the State of California, is designated as co-counsel</u>." (Emphasis added.) <u>See</u> Appellants' Opening Brief at 23. In fact, Ghiringhelli signed Groth's chapter 11 petition and was designated as Needler's "Co-Counsel" in Needler's pro hac vice application.

Where out of district counsel is to appear in a bankruptcy case, the requirement to associate local counsel serves a useful function. Local counsel can be assumed to be familiar with local procedures and practices and make that knowledge and expertise available to out of district counsel, thus promoting efficiency and lowering costs. Particularly in bankruptcy proceedings, where assets are limited and every available dollar needs to count, serving those objectives is vitally important.

Needler filed his application for employment as Groth's chapter 11 counsel on May 27, 2011, but Ghiringhelli's employment application was not filed until June 19, 2011, over three weeks later. Needler's employment application was first discussed with the bankruptcy court at the Status Conference. At the Status Conference, the bankruptcy court advised Needler that it would not approve his employment until local counsel was employed. The bankruptcy court further stated that it was aware that although California co-counsel did not have chapter 11 experience, he was knowledgeable about Groth's dealership and pension fund issues, and the bankruptcy court did not have an issue there. The matter was essentially wrapped up in the following colloquy:

THE COURT: [Y]ou've got to tie [your employment

-23-

application] in with California counsel.

NEEDLER: So you want me to continue that motion?

THE COURT: I think that would be best. . . .

NEEDLER: That's fine.

June 28, 2011 Hr'g Tr. at 14:7-12.

The UST subsequently filed its objection to Ghiringhelli's employment application.

At the Financing Hearing, Needler's employment application was on the calendar, but no hearing had been set on Ghiringhelli's application. The bankruptcy court advised Needler again that his employment application would not be approved until local California counsel's employment had been approved. The bankruptcy court went on to suggest that the problem with Ghiringhelli's employment application was that the proposed fee arrangement was not consistent with local compensation Guidelines. However, the bankruptcy court also suggested that any issues could be resolved in discussions with the UST.

THE COURT: I think it's something that could be easily worked out, I'm assuming. But until he is employed, I can't pick up your employment application aspect.

NEEDLER: That's fine.

. . .

THE COURT: . . . [W]hat you need to do is set his [employment application] for hearing along with yours and we can take them up together, and then hopefully I would suggest talk to the UST, see what their concerns are. If you can get his [Ghiringhelli's employment] worked out, then we can pick up your employment application. That's – so that would deal with that.

July 27, 2011 Hr'g Tr. at 5:7-18.

Whatever discussions subsequently took place between either of the Appellants and the UST, the UST's objections were not

-24-

resolved, and the Appellants' employment applications were set for hearing together on August 24, 2011. When the Conversion Motion was granted the day before, the hearing on Appellants' employment applications was taken off the calendar.

The record reflects that consideration of Needler's employment application was set over twice preconversion based on the bankruptcy court's concerns, consistent with the requirements of its local rules, that local California co-counsel's employment be approved before, or at least contemporaneously, with approval of Needler's employment. We perceive no abuse of discretion in the bankruptcy court's insistence on compliance with its own local rules concerning retention of counsel by a corporate chapter 11 debtor-in-possession.

B.  <u>We conclude that the bankruptcy court did not abuse its discretion in declining to approve Appellants' employment nunc pro tunc as Groth's chapter 11 counsel</u>.

The parties agree that the controlling authority in the Ninth Circuit, applied by the bankruptcy court, stating the standards for consideration of nunc pro tunc employment of estate professionals is <u>In re Atkins</u>, 69 F.3d 970 (9th Cir. 1995). In <u>Atkins</u>, former chapter 11 debtors Mr. and Mrs. Howard Atkins ("Debtors") appealed the decision of this Panel affirming the bankruptcy court's order approving the employment of Wain Samuel & Co. ("Wain Samuel") as estate accountants and awarding Wain Samuel compensation for services rendered.

The Debtors filed their chapter 11 petition on March 30, 1990. On May 21, 1991, Debtors' counsel contacted Wain Samuel, advising "that the [Debtors] urgently needed an experienced certified public accountant to assist their defense in an

-25-

imminent trial" with the IRS, in which the IRS sought "approximately $200,000 from the [Debtors] in unpaid taxes, interest and penalties, including penalties for civil fraud." Id. at 971. Debtors' counsel further informed Wain Samuel that the Debtors needed to respond to IRS interrogatories immediately. Otherwise, the IRS "would be entitled to summary judgment." Id.

Approximately one week later, on May 29, 1991, Wain Samuel representatives met with Mr. Atkins and his counsel. At that meeting, Wain Samuel agreed to review the IRS interrogatories and the Debtors' work papers promptly and immediately prepared an engagement letter for the work involved. Mr. Atkins signed the engagement letter the following day. Id. One of Wain Samuel's partners also referred the Debtors to an experienced tax attorney, whom the Debtors subsequently hired. Id.

Wain Samuel then proceeded to review and analyze the Debtors' financial records, a task characterized as "mammoth," and prepared and delivered draft responses to the IRS interrogatories by June 7, 1991. Id. Wain Samuel charged $4,000 for their services, which the Debtors paid. Id.

Thereafter, in mid-June 1991, the Debtors' tax attorney requested Wain Samuel to prepare more detailed and specific responses to the IRS interrogatories. The revised responses were completed by Wain Samuel by the end of July 1991. Also, in July 1991, Wain Samuel representatives prepared for and attended a lengthy meeting with the U.S. Attorney concerning the IRS litigation. In August 1991, Wain Samuel assisted the Debtors' tax attorney in preparing witnesses for depositions in the IRS litigation. Eventually, the IRS reduced its claim against the

-26-

Debtors to $85,000. Id. at 971-72.

In a sworn declaration, Wain Samuel asserted that throughout the firm's representation of the Debtors, Wain Samuel repeatedly raised the issue of bankruptcy court approval of the firm's employment with the Debtors and their attorneys and were repeatedly reassured that an application for their employment would be submitted, and they would be paid. Id. at 972. In November 1991, Wain Samuel contacted the Debtors' chapter 11 counsel to discuss the issue. Debtors' counsel requested that the firm prepare letters confirming services performed and payments received to date, which Wain Samuel prepared and sent. The Debtors refused to sign the letters. However, the Debtors continued to assure Wain Samuel that the firm would be paid when the IRS litigation was finally settled. Id. Thereafter, communications broke down between Wain Samuel and the Debtors, and Wain Samuel filed a motion seeking nunc pro tunc approval of their employment and compensation for their work as an administrative expense. Id.

On or about October 16, 1992, the bankruptcy court found the Debtors solvent and dismissed their chapter 11 case. All of the Debtors' creditors were paid in full. Id. However, the Debtors, acting pro se, continued to oppose Wain Samuel's application for approval of their employment nunc pro tunc. Id. The bankruptcy court ultimately found that "exceptional circumstances" justified approving compensation to Wain Samuel retroactively for the bulk of their services. The bankruptcy court specifically found "that Wain Samuel's work on the IRS litigation project was performed very quickly in an emergency setting, and that the firm's work

benefitted the estate by helping to reduce the IRS' claim from over $200,000 to $85,000." Id. at 973. The bankruptcy court further found that the timing of Wain Samuel's motion was not dispositive in light of the facts that the Debtors repeatedly had represented to Wain Samuel that they would secure approval for Wain Samuel's employment, and they had not made clear that they did not want Wain Samuel to perform services in their behalf. This Panel affirmed the bankruptcy court's rulings. Id.

In affirming the decisions of this Panel and the bankruptcy court, the Ninth Circuit noted that there are a number of factors that a bankruptcy court can consider in determining whether nunc pro tunc approval of professional employment should be authorized, citing, among other things, the nine-factor test set forth in In re Twinton Props. P'ship, 27 B.R. at 819-20. However, at an irreducible minimum, two standards had to be satisfied to establish the "exceptional circumstances" required to allow for retroactive approval of professional employment: The subject professionals "must (1) satisfactorily explain their failure to receive prior judicial approval [of their employment]; and (2) demonstrate that their services benefitted the bankruptcy estate in a significant manner." In re Atkins, 69 F.3d at 974 and 975-76, citing Halperin v. Occidental Fin. Grp., Inc. (In re Occidental Fin. Grp., Inc.), 40 F.3d 1059, 1062 (9th Cir. 1994); and Okamoto v. THC Fin. Corp. (In re THC Fin. Corp.), 837 F.2d 389, 392 (9th Cir. 1988).

At the Reconsideration Hearing, after noting that it had never ruled on the substance of Appellants' applications for approval of employment, the bankruptcy court advised Needler that

he needed to address the factors for nunc pro tunc approval of employment specified in In re Atkins. On appeal, while citing and discussing In re Atkins, the Appellants focus, as they did before the bankruptcy court, on their argument that they satisfactorily addressed all nine of the Twinton factors. Appellants' Opening Brief at 35-37. However, the bankruptcy court's final denial of the Further Rehearing Motion, adopting the Renewed Opposition, was based on its determination that the Appellants had not met the two Atkins requirements to establish the "exceptional circumstances" necessary to support nunc pro tunc approval of their employment: 1) an adequate explanation as to why they failed to receive prior judicial approval of their employment; and 2) a demonstration of significant benefit from their services to the bankruptcy estate. We first address the question of "significant benefit."

"Significant" is a relative rather than a fixed standard, requiring a case-by-case analysis of the evidence. In Atkins, the significant benefit to the estate was an approximate $115,000 reduction in the IRS tax claim. So, the Ninth Circuit recognized a substantial financial benefit to the Debtors' estate realized from Wain Samuel's services.

In this case, it is hard to argue that Ghiringhelli contributed any significant benefit. As recognized in Appellants' Opening Brief, Ghiringhelli's only service to the estate was that he signed Groth's bankruptcy petition. Appellants' Opening Brief at 24. On the other hand, there is no question that Needler did a number of things for Groth while it was in chapter 11. We characterize Needler's services in two

-29-

categories.

First, Needler contributed services that kept Groth's chapter 11 case going: He advised Groth's personnel as to how operations were to be conducted in chapter 11. He prepared Groth's original and amended schedules and SOFA and other filed documents. He attended and assisted at Groth's initial interview with the UST. He discussed Groth's situation and prospects with various creditors and service providers in order to maintain operations. He made certain that a timely appeal of the judgment in the union litigation was filed. He entered into discussions and negotiations with various potential financers of Groth's operations and purchasers of Groth's dealership franchise. He drafted the Initial Plan and an amended plan.

Second, Needler performed services that potentially added value to the estate: He negotiated the Emergency Financing and filed and advocated the Financing Motion. He also negotiated and presented the proposed sale, as described in the Sale Motion.

However, the Emergency Financing was rejected as proposing financing arrangements with high up-front fees, at a high interest rate and a short maturity, and requiring as a condition that the lender be given a substantial equity interest in Groth for essentially no consideration. The proposed sale never was considered by the bankruptcy court, but it entailed selling Groth's dealership franchise for half Groth's stated value at the outset of the case and provided for granting a 30% equity interest to insiders. The proposed sale was subject to GM's approval, and such approval was only at the negotiating stage. Based on the obligations reflected in Groth's schedules, the

-30-

proposed sale would likely generate no distribution to general unsecured creditors. Groth's amended plan, prepared by Needler, in fact did not project any dividend to unsecured creditors. In the meantime, while Groth was in chapter 11, a period of approximately three months, it generated operating losses of more than $150,000 a month, before considering Needler's requested fees and costs as administrative expenses of $177,115.61. The Trustee argued that Needler's efforts merely delayed Groth's inevitable liquidation and contributed to the estate's accrual of unpaid postpetition debts that diluted the interests of prepetition creditors in any ultimate distribution from the estate. In these circumstances, the Trustee argued and the bankruptcy court found that Appellants' services contributed no significant value or benefit to Groth's estate.

Based on the record before us, we have no doubt that Needler performed many services in Groth's behalf, and reasonable minds can differ as to the significance and benefit of those services. However, the bankruptcy court found that Needler's services did not confer a significant benefit on Groth's estate, and we are in no position to second-guess the bankruptcy court's fact finding on that issue. Since we conclude that the bankruptcy court did not clearly err in its fact finding concerning one of the two essential Atkins standards, we do not need to reach the other, i.e., the question as to whether the bankruptcy court clearly erred in finding that the Appellants did not provide a satisfactory explanation for their failure to receive earlier approval of their applications for employment. Ultimately, on this record, we cannot conclude that the bankruptcy court abused

-31-

its discretion under the Atkins standards in denying nunc pro tunc approval of Appellants' employment as Groth's chapter 11 counsel.

C.    The bankruptcy court did not err in denying compensation and reimbursement of expenses to Needler.

The Bankruptcy Code authorizes compensation and reimbursement of expenses to estate professionals only after they have been employed pursuant to § 327 or § 1103. Section 330(a)(1); McCutchen, Doyle, Brown & Enerson v. Official Comm. of Unsecured Creditors (In re Weibel, Inc.), 176 B.R. 209, 212-13 (9th Cir. BAP 1994); DeRonde v. Shirley (In re Shirley), 134 B.R. 940, 943-44 (9th Cir. BAP 1992) ("Court approval of the employment of counsel for a debtor in possession is sine qua non to counsel getting paid.  Failure to receive court approval for the employment of a professional in accordance with § 327 and Rule 2014 precludes the payment of fees."); 3 Collier on Bankruptcy ¶ 330.02[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

Since the bankruptcy court declined to approve the Appellants' employment as Groth's chapter 11 counsel, a decision that we affirm, the bankruptcy court did not err in denying Needler's application for compensation and reimbursement of expenses as Groth's chapter 11 counsel.

## VI.    CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's decisions declining to approve Appellants' applications for employment as Groth's counsel in chapter 11 and further declining to approve Needler's application for approval of compensation and

-32-

reimbursement of expenses as Groth's counsel.

-33-